Carter v. Hewlett-Packard Good morning, Your Honors. May it please the Court, Mark Lipton for the plaintiff's appellant. Debra Carter. Your Honor, I'm going to address, there's three cases that have come down since briefs were filed that bear on the issues in this case. Two of them I've written the Court letters on. The third one came out about two months ago. The three cases are Saffron v. Wells Fargo Bank, Wells Fargo Loan to Disability, Glenn v. MetLife, and Burke v. Pitney Bowes. The first two I've sent you letters on and cited. The sites, Burke v. Pitney Bowes is a four. I have a 45 EBC 1140 site. It's a September 19th, 08 case. Before I go into the impact of those, if the Court would appreciate allowing, I'd appreciate if the Court would allow me a little bit of a running start to get where we need to go. By the way, if you have supplemental authority that's not cited and you haven't given the 28-J letter on, would you just Let me finish. What you do is you give that authority to our clerk of court who will then, after the argument today, and then she'll transmit it to us, all right? Thank you very much, Your Honor. All right. Proceed. The appellee raises an argument that despite the treating physician, urologist, Dr. Snyder's four-page form that he filled out for VPA, he never said that the appellant couldn't work, that Ms. Carter couldn't work. And one thing I've argued is, well, it was self-obvious from all the limitations he put. But that's actually not true because we really go back almost a year and a half to two years to see how this whole thing started. And at page 393 of the administrative record that was submitted below, there's a form that VPA sends the treating doctor to fill out, and it's an extension of a disability form. And that form was originally filled out by Dr. Snyder, limiting Ms. Carter to disability up until January of 2003. Then the next form Dr. Snyder filled out, Your Honor, the same form sent in by VPA to Dr. Snyder, is at page 247 of the record that was submitted below, and that form, Your Honor, is dated January 16th of 2003, and it limited Ms. Carter's extended her disability. He's saying she's disabled, cannot work on a form VPA supplied until January of 2004. Now, when they got that form, Your Honor, she no longer was in the first year period where mental disability would qualify, so they had to look at that was a urology report, interstitial cystitis, and on it he notes interstitial cystitis, and he puts a diagnostic code for it. According to their rules, and this is in the appellee's excerpts of record, they have in their excerpts of record the agreement with VPA, and the agreement with VPA in addendum B, which is the defendants 00554 and 555, says when that form is received by VPA, if the doctor's diagnosis and return to work date are approved by the disability yardsticks that they use, we've never seen those, we've never been given those protocols, those yardsticks, but if it's approved, the disability is extended. If not, if there's not, if it's too long, if the doctor extends the disability longer than their yardsticks would generally suggest, or if it's vague or unclear, VPA is to contact the doctor requesting more documentation. They did that. They sent Dr. Snyder a four-page bladder residual functional capacity questionnaire. So now he's said twice she can't work. Then they get sent the questionnaire for clarification, and he fills out a four-page questionnaire saying she has interstitial cystitis, positive potassium chloride test, tender flank pain, she's been to chronic pain management, she's been on diets, treated for it, taking medications, and she gets a denial letter that ignores his four-page report. They never analyze it, they never comment on it, they never explain why it doesn't apply. Console, let's call that your running start. I'm sorry? Let's call that, you said you wanted a running start. Okay, and that's, okay, so I just wanted to go back to those two reports of the doctor. Console, you have to stop and listen to what the Court's saying once in a while. Yes, sir. Understand? Okay. Let's talk about the structure of this. The summary plan description uses the language result. If it results, if it's a result of a nervous or mental disorder, right? Correct. Just for the sake of the argument, without your granting it to be true, let's assume mental or nervous disorder has something to do with this person's disability. So that's what it says. The plan says the same thing, but before that the plan says it has to be and only needs to be contributed to by a mental illness. Now, I believe that the briefing you suggested, well, there's some kind of ambiguity between. Correct, Your Honor. The question I want to ask is you don't seem to say that there's an ambiguity in the plan itself. You're sort of developing as an ambiguity between the SPD and the plan. Is that purposeful? You don't think there's an ambiguity in the plan, or? Your Honor, the plan is not ambiguous. Ambiguous on the combination issue and the contributed to issue that you're raising. That's a question of whether the administrator has to consider both physical and mental impairments or whether a combination cannot be considered. Under the plan, the way it's written, it's clear a combination couldn't be considered. If the plan language was in the SPD, then a combination wouldn't be considered. If she had a mental impairment that affected her disability and was in combination, the exclusion would apply. But the SPD, which is the controlling document under Burke, because the most favorable document is the one we look to, the SPD is not ambiguous. Excuse me, the SPD is the one that is ambiguous, and it says results from. And under Hughes v. Patterson and Gunn v. Reliance Insurance, that language, results from, is ambiguous, and it does not allow them to exclude a combination mental-physical impairment. The SPD is, with a slightly different language, precisely the same as A, mental illness in the plan, right? So there's not an ambiguity between mental illness in the plan and the SPD itself as far as that's concerned, correct? The definition of mental illness is the same in both the plan and the SPD. Right. It's the question of the results from or in combination with. Okay. And that's what I'm trying to understand. The plan says caused or contributed to by a mental illness. Correct. The mental illness says that if it's a disability where there is a nervous or mental disorder, if the disability results from a nervous or mental disorder, which sounds like the disability results from mental illness, then these things follow. But then before that, it's introduced by saying caused or contributed. But you think those go together okay, is that right? That's okay. But that preamble, the caused or contributed language, is not in the SPD. Right. And the participant has the benefit of the SPD, and that absence, as Patterson v. Hughes says, creates an ambiguity that's in our favor. And as such ---- Is there a Ninth Circuit case that, you know, Burke in the Ninth Circuit takes care of the reverse situation? Is Burke says that the SPD ---- I apologize, Your Honor. Go ahead. Why don't you tell me? I was going to say Burke says that the most favorable document is what applies to the participant. Well, it doesn't exactly say that. It's applying it to a flip situation where the plan is different from the SPD, but not in this sense. It's in a different way. The plan was more favorable to Burke, to the pilots, than the SPD, but the Court does say the most favorable document. In Burke, it does say the most favorable of the two. Well, no. Burke ---- that's why I'm trying to ask you if there's a Ninth Circuit case on point. Burke dealt with a situation you just said. It's cited to a bunch of out-of-state, out-of-circuit cases that said the flip side, but Burke doesn't say we're adopting the flip side. It just says we're going to apply that principle here. My question to you is, is there a Ninth Circuit case, to your knowledge, that adopts the flip side? Well, Your Honor, I ---- If Burke doesn't do it. If Burke doesn't do it, Your Honor, then we'd rely on the regulations which specifically say ---- He's asking for a case. If you can answer it simply, I think we'll get to the bottom line more quickly. There's no case that says that precisely. That's the answer. Correct. Okay. I'm sorry, Your Honor. No, that's all right. And I was going to say ---- But you may be answering a question that he's not asking by going on. So I know you have a few more questions. Go ahead, Jeff. No, that's okay. I was trying to ---- You clarified it beautifully. I appreciate the dialogue, and I apologize for my step. So then you rely on the regulations. That's what your ---- that was your follow-up answer, correct? If Burke doesn't get you where you want to go, then you rely on the regulations. Is that what you're saying?  The regulations specifically say the SPD must have all limitations and exclusions in them. And so that's that the SPD in this case does not contain the same limitation that the plan contains, and therefore it would be defective. And, again, the benefit would go to the participant because the language in the plan is not compliant with ERISA. So that's where it would be my backup position if Burke's flip side doesn't work. And Banuelos, to some extent, no, Burke basically is the best case I have. Yeah. Dealing with Safon v. Wells v. Fargo Bank, Your Honor, that case brought in Bunnell v. Sullivan, a Social Security case, and said that pain cannot be dismissed because it's supposedly subjective, that it should be considered if there's an underlying pathology that could generate the pain. And in our case, we have that. And the pain that the participant was complaining of was completely ignored. Glenn v. MetLife, that went on to talk about structural conflicts and elaborated on Abbate basically by indicating that if there is a structural conflict, it is a factor to be considered in terms of abuse of discretion. And Burke v. Pitney Bow went on to say that a structural conflict can exist even if there's a trust fund that holds the monies that are paying out these benefits. If the employer is funding that trust fund, in the instant case, not only is the employer funding it, but the addendum C to their agreement with VPA requires VPA to give them annual information for actuarial purposes to determine how much they're going to have to fund. He mentioned the pain issue from Social Security cases. This, of course, isn't a Social Security case, so let's ignore Social Security cases for a moment. What do you do with a situation where the plan says that we will only look at objective things? We don't look at subjective stuff like pain. First of all, Your Honor, Safon v. Wells Fargo, which is an ERISA case, approves Bonnell. It approved Bonnell. It says in ERISA context, the fact that Bonnell was a Social Security case does not mean we are going to ignore pain as subjective. So Bonnell has been adopted by the NYSERCA. That case did not have an indication that I saw a pain. Now, let's look at the plan. The plan said we are only going to consider objective factors. Now, that's a vast difference from Social Security, and if there aren't — if there's nothing in the plan, maybe we are going to start importing Social Security pain stuff into it. But this plan says we only look at objective things. What do you do with that? Okay, Your Honor, the definition of objective in the plan, it means objective medical evidence means that evidence which establishes facts or conditions as perceived without distortion by personal feelings, prejudices, or interpretations. It does not say objective test results. It does not require a limitation to specific physical findings. In our case, we have a diagnosis of interstitial cystitis. We have a positive potassium chloride test, which that's an objective test. Dr. Weingarten specifically says there is little in the way of objective findings. He doesn't say there are no objective findings, number one. Number two, his direction was based on a claim form he was given to fill out, a functional capacity form, which said he was just to look for test results. It didn't give him the same definition. I just read the court. And, you know, furthermore, Dr. Weingarten, neither Dr. Weingarten nor the plan administrator has ever told anyone what additional tests would be expected. And ERISA requires this to confirm a diagnosis of interstitial cystitis and the severity that's complained of by Ms. Carter. She's been blindfolded this whole time. Her doctor filled out a four-page form after two disability extension forms, answering every question, citing a positive objective test. And there's no personal feelings, prejudices, or interpretations he was applying. He's a urologist specialist, as it says on the forms. And his four forms were not mentioned by Dr. Weingarten, his four pages of forms, which came after our appeal was over. SAFON says you shouldn't do that to us. You should give us a chance to see the report when we get an appeal still ahead of us. The claims administrator never mentions those four pages, and no one in the VPA never, ever comments on even Dr. Weingarten's requirement of frequent bathroom breaks and how that might affect her ability to work. Not even mentioned. Thank you, Counsel, and your time has expired. Thank you. Good morning, Your Honor. My name is Joe Bush. I'm here on behalf of Hewlett-Packard and the Hewlett-Packard Disability Plan. At the time that the plaintiff began her short-term disability benefits, the name of the plan was the Income Protection Plan. Since then, the plan has been amended to its current name of the Hewlett-Packard Disability Plan. I would like to respond to, first of all, just the beginning of Counsel's argument when he cited to an early 2003 assessment of Ms. Carter being impacted by interstitial cystitis. That was in January of 2003, as he remarked. She was receiving short-term disability benefits at that time and continued to receive short-term disability benefits until September of 2003. And under the standard of the plan for short-term benefits, the standard was the Hewlett-Packard occupation. In other words, was she disabled from doing her job at Hewlett-Packard? And she continued to receive disability benefits based upon that until September of 2003. Now, this is the second time, Your Honors, that we're up here. We were here in August of 2006. The matter was remanded back to the district court to consider abetai in the first instance. The court did consider abetai. She ruled, first of all, that there was no structural conflict of interest in this case because although Hewlett-Packard funded the plan, it was VPA, Voluntary Plan Administrators, who made the decisions on all benefit determinations and on all appeals of a denial of a benefit determination. She found no structural conflict of interest and applied the deferential standard of review. She then focused on the other aspects as to whether or not there were procedural errors. She first focused on whether or not there was a flagrant procedural error and found that there was no flagrant procedural error. Looking at the Blau v. Del Monte case, in this instance, she was given an opportunity to provide a response. She was given an opportunity to appeal. She was provided not only with a summary plan description, but when her counsel asked for a copy of the plan document itself, that was provided as well. And, of course, ERISA section 104B requires that, on request, a copy of the plan document be provided to a participant. So there's no blindsiding here. There's no issue about whether or not she was aware of what the terms of the plan provided. And there's no issue that she was not aware of the cover statement on the summary plan description, which specifically noted that this was a summary only and that the full terms of the plan are to be found in the plan document and you can get a copy. Does that make a difference? Excuse me, Your Honor. Does a disclaimer on the front of an SPD mean that the SPD doesn't have to list the exclusions, et cetera, because that's all you should know? You have to go look somewhere else? Certainly not, Your Honor. The statute does require that the summary plan description have the, must meet the statutory and regulatory requirements. Okay. Now, let me ask you. If the SPD says, you know what, you don't get a benefit if condition A occurs, and the person says, okay, and condition A doesn't occur, but then the plan says you don't get a benefit if condition A and or B occur. So when the person makes the, applies for the benefit, says, well, my disability didn't result from my mental problem, and the plan says, aha, but it did have, your disability was somehow affected by it, and therefore it contributed to your disability, and that's condition B, and therefore you lose. Does the plan get away with that? Your Honor, I think that what you're asking is whether or not the use of the word resulting from, as opposed to using the full phrase contributed to or caused by, constitutes an inconsistency. I don't think it's an inconsistency. Well, yeah, I'll call it an inconsistency, whether that's an additional consideration. The law requires that the summary plan description be written in a fashion which is understandable to the common person. And the courts have focused on whether or not there is a specific inconsistency between the terms of the plan and the summary plan description. Yes. And as Judge Wilkins noted in this case, there was not a specific conflict of interest. And what the courts also looked to. Now, before you go on, I mean, I assume you would concede that if there is a misrepresentation in the summary of what contained in the plan, that that would certainly not meet the regulatory standard. That would certainly be incorrect. And what the courts do. Would it entitle the beneficiary to the benefits promised in the inaccurate summary? My reaction would be no, and we have not briefed that issue. My recollection of the rule. How would that be in light of our case law? That's what I was going to try and get to, Your Honor. I don't have the cases off the top of my head. My recollection, though, is that the rule in the Ninth Circuit is that if a participant is shown to rely on the misrepresentation, that that may create an element of estoppel. Not only must the misrepresentation be made, but it must cause some form of reliance on it. In this instance, I don't believe there is any showing of reliance. I don't believe counsel tried to do that. What do you mean by reliance? For example, an individual is told, and most of these come up in the pension plan context, Your Honor. And they're usually verbal or letters. They're not an SPD. They're sometimes verbal and they're sometimes letters. And they're sometimes in SPDs? I haven't seen one in an SPD yet, Your Honor. Nor have I. So let me ask you, how would you deal with that? Suppose the SPD has a misrepresentation. Now, look, everybody knows it is a practical matter. The time of reliance is when I stay with your company and or when I put my contribution into the plan if I had to contribute to the cost of it. But the point of these plans, I take it, is that companies, although they are indeed benevolent, aren't entirely benevolent. They think that they give their employees something, the employee will stay with them. So they tell the employee, look, if you meet, SPD says if you meet condition A or if you don't fall under exclusion A, you get a benefit. There's where the employee relies, not later on when her lawyer orders up the plan document. Isn't that true? I would disagree that the courts in this circuit have taken the position that staying with an employer constitutes reliance on a misrepresentation. I do know that the courts have taken the position that if based upon it, they make an action. And why I was saying in the retirement plan context, someone retires early, terminates their employment with the expectation that I'm going to get a full retirement benefit at age 55 because I have 30 years and 55, 30 years of service and age 55. Under that rule, I get to retire. I quit my job. I retire. And all of a sudden, I don't get a full retirement benefit. That's the context in which I had seen the reliance imposed. I have not seen a court either in this circuit or another circuit, and I can't say that I'm omniscient on all of the cases that have been decided, Your Honor. But I take it. That has said that simply remaining in employment constitutes reliance. All right. But let's – let me change the question slightly. If there is a misrepresentation or an inaccurate representation of the plan documents in the summary, doesn't that constitute a procedural irregularity? I don't believe so, Your Honor. Why would that be? Because there is nothing that the participant would have done to incur a disability. In other words, the participant either has pain disorder, as we see on page 242 of the diagnosis that was given by a medical doctor who was also treating her for interstitial cystitis. So there is nothing that she does to rely on what is contained in the summary plan description. Why is reliance a component of determining whether there's procedural irregularity? Because a procedural irregularity is one which prevents her from submitting her evidence in support of her claim for disability. As a matter of fact, that's even what the Burke case talks about that counsel cited that was decided on September 19th. You're looking at the procedural irregularity. However, she was given the opportunity and did submit all of her medical records in support of her claim for disability. And remember that her claim for disability for long-term benefits was based on not just interstitial cystitis, but interstitial cystitis, fibromyalgia, depression, and mood disorder. Those were the reasons that she cited. And the issue posed by her claim is, was there any condition permitted by the plan for long-term benefits that caused her not to be, that caused her to be disabled from working in any occupation? And no doctor so opined. Well, part of the question I have in this case, let's just talk about the interstitial cystitis for a minute. Your doctor faulted her for not providing objective evidence of that. What evidence would have been needed? He didn't identify it, Your Honor. What he did say. Have you looked at the medical? You obviously have looked at this disease. Yes. His report doesn't say. We know that there was one instance where she has a positive urology test. Right. Why isn't that enough? We know that in the summary that he gives, all of her other urology tests are negative. But this is an odd syndrome or disease that sometimes is not easy to diagnose. There's no, probably no definitive test except for an invasive procedure, right? So we do have objective evidence with the potassium test. My question is, not to debate the medicine, but to say what did she need to show and why didn't she say, show this, and then we can consider your claim. Assuming she had interstitial cystitis, no doctor who was treating her for that condition. Not Dr. Alvarado, not Dr. Snyder, and not Dr. Rulon, found at page 242 of the supplemental excerpts of record, reported that she was disabled because of interstitial cystitis. We had several doctors who were treating her, Dr. Dwyer, Dr. Preble, Dr. Rulon, who said she was disabled because of major depression and chronic pain syndrome. Dr. Weingarten's analysis was not inconsistent with what her own treating physician said. And that's what the court below focused on. The key here is that no doctor was willing to say that she was disabled. Dr. Alvarado, his report was submitted after the close, excuse me, during the course of her appeal. He didn't say it. He said she needs frequent bathroom breaks, and we asked that employers accommodate that. Yes. So we have what they – I think what he said, if I'm recalling the record correctly, is that she could only work two hours a day, maybe, right? Say again, Your Honor. She could only work two hours a day? No. No. That's not – she could – what Dr. Snyder said was that she could only sit for two hours consecutively in a day. So not that she couldn't work eight hours, but she would have to get up at least every two hours. Why don't you think you were required to get the opinion of an occupational therapist using the hypotheticals provided in the medical records to say what job can she perform? Because, as this Court noted in McKenzie and also in the Panabaker case, which was decided on September 18th, a vocational assessment is not always required. There's nothing in the plan that requires it. And her own doctors did not say that she was disabled due to that condition. Then why was the letter written implying that you were going to conduct a vocational assessment? There was a letter written to Dr. Weingarten. Right. It was not written to the individual. To your doctor. Because, in other words, they – what they were going to do was we would do the functional capacities evaluation if what we decided to do based upon your report, if we thought we would need one. Okay. She wasn't saying that they were absolutely going to do it. And if that's what's required, then the proper remedy is to remand and then to remand back down to do a functional capacities evaluation. Okay. Our questions have taken over your time. Judge Fernandes, do you have any more questions? Okay. Thank you, counsel, for your argument. Thank you. You have just a brief period for rebuttal. First of all, the estoppel argument is not correct. Estoppel applies when there's a statement made, either written or verbal, in variance with the summary plan description. That's when the estoppel issue comes up in detrimental reliance. When the SPD does not contain an exclusion or limitation as the regs require, the SPD can be relied on without showing reliance by the participant, and they're entitled to the benefit that the SPD has promised. So the long line of estoppel cases have nothing to do with SPD deficiencies, rather than it's an extra document. The other thing is Dr. Snyder, at page 247 and 393, filled out forms which did not say unable to perform usual job versus any job. It was just cannot return to work. And all he said in those forms was cystitis interstitial IC09 code 595, history of cervix cancer code 180.9 as secondary. The first one was primary. Nothing about depression, nothing about mood disorder. It says return to work date January 1 of 04. The year before he filled the same thing out, giving her a return to date January 1, 03, and then he extended it to 04. He never limited it to just her usual job. Okay. So that's an error. And the final little remark I'm going to make is that while we were given the plan description and all of those things, the initial denial in the record does not explain what further documents or material or tests, as the court pointed out, could be supplied after Dr. Snyder had filled out the four-page form, submitted two extensions of works over two years. What more did you need from us so we can perfect our appeal? And if anything, Boutin and Safon say we're entitled to be given that information, and that you can't wait until after we've submitted our appeal, then send it out for the first time for a medical review. The first denial was not based on any medical review. No medical practitioner looked at it. You can't wait until then, and then you send it out after the appeal claim has run to after the fact justified and you can't wait until after the appeal claim has run to after the fact justified. So that's my argument. Thank you, Your Honor. Thank you both for your arguments. The case has certainly been submitted. It presents a lot of interesting issues. We'll take it under submission.
judges: Fernandez, Nelson, Thomas